Good morning, Your Honors. Michael Swartz for Petitioner Appellant. We've had a lot of technical issues being heard today. This one I think is pretty straightforward. It is the standard for determining the fair market value of the property at issue at the time of death. The IRS code, the Treasury regulations are clear on this. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts. Sotomayor The tax court adopted that standard. You think it just misapplied it, right? Michael Swartz I think it's misapplied. I think the issue is Sotomayor So the law, you're not contending that it misapplied. It should have concluded that the fair market value at the time of death was substantially lower. Michael Swartz Well, I think we're skipping a step that I would argue that. The standard in determining fair market value misapplied the as-is valuation. When you Sotomayor Well, see, that's where we're going. I'm not sure there's a misapplication of the law here. The tax court clearly recognized the law. The tax court determined that at the time of death the fair market value was substantially higher than you think it should be. But I'm having difficulty figuring out how the tax court misapplied the law. Michael Swartz Well, there are numerous cases that talk that distinguish between as-is value and the inherent value. And the determination here, I believe, or we're arguing, was made based on the inherent value. Sotomayor Well, where does the tax court say that? See, I thought the tax court — I understand you have evidentiary arguments that why one appraisal should have been adopted over another. But I don't see anything in the tax court's decision that says I'm adopting an inherent value model. It says, as I read it, gee, the guy from Sotheby's was convincing. I thought that a willing buyer would pay a willing seller this amount at the time of death for it, notwithstanding its dirty condition, because a willing buyer with knowledge would know that the dirty condition could be fixed up pretty easily. Michael Swartz Well, that was certainly part of it. But I think inherent in how the court looked at the issue was looking at subsequent events and heavily relying on that. That's weighing the evidence a little bit. But  subsequent event did the court rely on? What the court said was someone who bought this at the time, as the Sotheby expert testified, would pay more than Sotheby. Actually, the court deterred less, but the Sotheby expert gave a number because that buyer, a reasonable buyer, would have known that the dirt could have been easily been cleaned off with relatively little risk of damage to the painting. And the buyer could have told its provenance, I'm talking about the more valuable painting, at the time, even though it was dirty. So if those facts are the ones that seem to give me trouble in . . . Justice Breyer Well, you sort of nailed it as to that's exactly what the court found, but that's where the court got it wrong. And I'm relying in saying that the court got it wrong on Seventh Circuit authority and others, the court claims authority in terms of how a present market value, fair market value determination is made. And I'm quoting from the National Bank and Trust v. United States case, and I'm just going to quote it because it says it better than I could. An unsigned painting by Botticelli languishing in a secondhand art shop with a minimal price tag always had the same inherent value which it acquires when the creator of the painting is later discovered. In the second sense, however, value is a practical process, always changing in accord with the price that it will yield on the market at a given time. In this sense, the undiscovered Botticelli has a value far less than its inherent value. The code and regulations clearly enshrine that second sense of value. Scalia But the difference there is, of course, that there's a market value assigned by the shop to the Botticelli. And here, there was no market value assigned by anyone, so we have to figure out what it was. Justice Breyer Well, there are two issues. The issue is that the paintings are dirty. Everybody agrees on that. There are two undiscovered things. One is, will the painting be physically harmed by cleaning? Nobody really disagreed that. In today's day and age, there's no real danger with the chemicals. The cleaning process wasn't an issue, and that's really all the court analyzed. The other issue is if the underlying condition, which we're arguing that the court didn't take into account, which is an error of law, is the court didn't look at the as-is value. He assumed that he didn't at all analyze the as-is condition as opposed to the underlying inherent condition that might be revealed by the cleaning, which is, these are 17th century paintings. They have holes in them sometimes. There's restoration work. There was a lot of testimony about things being invisible, and there was substantial testimony that at Sotheby's, and our expert, Mr. Wachter, has appraised and been involved in thousands of sales of Bruegels, sometimes there's a market out there where these paintings are not because there's a risk that cleaning will damage them, but because the inherent value, whether it's a Botticelli or something less, will be revealed by the cleaning process. And that's where the trial court just missed it on that issue. Well, but didn't, see, this is where we're missing each other, too. I thought the Sotheby's expert said a reasonable buyer, looking at this in the condition that it was on the date of death, would have paid, he said, more than the district court concluded, but $2 million. No, no, at Sotheby's, the expert said $500,000. I'm sorry, the... Sotheby's was the estate's... I mean, the other expert, the other, the professor. Sure. The professor and Mary Ann. The professor, the professor said, in effect, somebody would pay $2 million for this in its dirty condition because one could look at it and see that it was a Bruegel, and one would know that the cleaning wouldn't be very expensive or damaging. And so isn't that an as-is appraisal? That's my difficulty. The district, the tax court says, no, it wasn't quite worth that much. It was worth a little less. Well, it's interesting because I think it's, it's, and I... And I apologize for confusing you. No, that's not a problem. Look, I think, I think the brief and I think the arguments in part are looking at this almost like a jury verdict. If you can search the record and find some evidence in the record that, that somebody testified about something, then there's sufficient evidence. But, but, but the jury instruction by analogy was wrong here. In other words, the district court did not apply a rule that looked at that issue. The district court, when you look at the trial, I'm sorry, district court, the tax court, tax court decision did not look at the issue of what a willing buyer would look at at the time with it in a dirty condition and whether there would be any discount because it was dirty. And not because it, not because there was not, I'm not talking about the risk of cleaning it and the damage that would ensue. I'm talking about the fact that there is an underlying inherent issue that would be taken into account. So what in its, what in its rulings suggested it didn't do that? Because if I reconstruct its reasoning, it was the expert says a willing buyer would have paid $2 million at the time. I'm roughly the number. Right. But I don't think a willing buyer would have. I think they would have only paid one seven because, you know, there would have been uncertainty. There would have been some uncertainty about the cleaning process. Yes, but what he did in part, and this is primarily expert based testimony in this particular proceeding, he eviscerated our expert because he didn't judge this other issue that he was heavily relying on as being relevant at all. That is, he eviscerated the expert by saying, by talking about the fact that a willing buyer, the tax court said, would look at whether it was cleanable or not and investigate that. What he, what was interesting is what the tax court said is that, but there are, there are these window tests that require you to like apply some chemicals to look at the underlying condition of the painting. He said, I'm not going to take that into account because a reasonable buyer and seller wouldn't go that far and actually explore the underlying condition of the painting. He said, I'm not going to consider that. So we can tell from the way he analyzed the experts and criticized our expert and undermined and found him not credible because he, he only focused on the fact about the risk of physical damage to cleaning. So it's clear from his decision and the, and my opposition points to the fact that you can find in the record issues where their expert, Dr. Cotterdell, looks to what happened in the past, looks at, he claims he looks at prior painting, pictures of the paintings in the 30s, which again is like 70 or 80 years ago, to say you could tell that the inherent condition of the painting was not a problem. There was a dispute though, and there was no credibility finding about whether that was even the same, the picture of the same painting. So, sorry. So is that where we are? I mean, the central issue in this case here is that it's whether a person would reasonably know after the effect of the cleaning and what it would have on the painting, right? Right. And Judge Hurwitz's words, like whether a willing buyer and seller would, there would be some discount applied at the time of the purchase or sale because you did not know that inherent underlying value. And, and your argument seems to be that a buyer could not have known with certainty that a cleaning would not reveal any flaws. Correct, correct. Okay. But isn't that just a risk assessment about cleaning and the relative likelihood of whether or not that would reveal flaws because buyers, it seems like generally can't be absolutely certain about anything, but based on the facts, you can draw reasonable conclusions about risk. And it seems like the tax court took a different view of that risk than your client would have but it seems to be very fact driven. And in the end, a battle of the experts. Well, it certainly was a battle of the experts, but again, inherent in the credibility determinations the court made, he said that our expert by taking into account, you know, was not credible because of the numbers he used and what he, what the court heavily relied on was a subsequent event of this 2009 sale of one of the paintings in Maple. Did it rely on it? Oh, clearly. Do you think the court said, because it was sold at that amount, that enters into my valuation of it at the time earlier? Well, he certainly said. He mentioned it because it's everybody, no sense hiding it. Everybody knows what it is. But does he rely on it in order to evaluate? Well, he, you know, it's tied into his assessment of the credibility of the expert. He cites it as an express factor in rejecting the Sotheby expert's testimony. But both sides seem to have highly qualified experts in this area and the tax court seems to have credited one over the other for reasons that seem to have support in the record. So I'm just trying to figure out, how can we overturn that? Do you have? Well, if I, frankly, if I thought that was what happened here, I wouldn't have appealed. I think that fundamentally the court got it wrong in assessing what an as-is valuation is as compared to an after-the-fact inherent value determination. And I don't think that, I think that the way that the court looked at it based on analyzing the decision as we've laid out in our papers, the court took into account the subsequent event of cleaning and the auction and heavily weighed that in his valuation determination, which I think is the wrong standard. Did the professor, their expert, their expert doesn't seem to have taken that into account. Right. His testimony was, looking at this at the time, our hypothetical reasonable buyer would have paid $2 million for the more expensive one of the two, because, you know, notwithstanding all the problems that your expert talks about. So your argument is not that there wasn't evidence in the record to support the tax court's conclusion, but that the tax court was relying on something other than their expert's testimony to reach its conclusion? He was certainly relying on their expert's testimony writ large. But, I mean, if you accept my premise that he wasn't applying the right methodology, if you will, the right as-is framework that the Seventh Circuit— So my question is, are you disputing the methodology of their expert? Or the methodology of the tax court? When I read their expert's testimony, it seems to be an as-is sort of testimony. You might not find it credible, but it is an as-is. Well, the tax court didn't address this issue. So I have an issue with the tax court's methodology. As far as the professor, Dr. Cardile, he said basically he could determine there was no a discount for the dirtiness of the painting. He said it would clean well. And he said, I looked at paintings—I looked at what I thought were pictures of the paintings from the 30s, and I could tell there wasn't much damage and there was no evidence of any intervening issue that happened in the next 80 years or 70 years. So therefore, I conclude that the paintings are—that it was determinable that the paintings upon reasonable investigation were in good shape. But the tax court made no findings on that. We heavily disputed whether those were the correct photographs, whether they even matched up to these paintings. And so there was no finding about or discussion, frankly, from the tax court as to looking at as-is value versus inherent value. Which, you know, there are circuit courts that have pointed expressly to that distinction as being significant in the valuation determination. Before your time ends, do you have any insight as to why the tax court took almost six years to decide this? No. No. It's very—I've got to say, as a matter of sort of like justice, it's very disappointing to my client, very upsetting that it took so long. Frankly, I wonder if it impacted the credibility determinations. I mean, we were one day out of the tax court's year nearly six years earlier. It's a little baffling. Well, but you could have made a deposit to the IRS. That's true. Yeah, I understand that. Isn't the tax court notoriously lengthy in issuing decisions? Not to—I mean, I don't have enough basis to say either way on that. All right. Thank you. Good morning. Cheryl Wong for the Commissioner. I want to start by unpacking the standard of review and also where we have a question of fact and where we have a question of law. Generally, as this court knows, evaluation cases are—review for clear error are very fact-intensive, but the estate raised two subsequent events that it argues should be reviewed de novo, and these subsequent events are the cleaned condition of the paintings and the sale price of the maple. And again, I want to step back and clarify that we don't have an admissibility question because I think some of the case law is a little ambiguous about whether—the language is a little ambiguous as to whether a trial court can take into account these subsequent events. That's phrased in a way that's as if it's an admissibility question, but that's not what we have here. Yes. Well, did the tax court in this case take those subsequent—it certainly mentioned them. Yes. No doubt that it mentioned them. Did it take them into account in its valuation of the paintings? It affected its valuation, but the question is how, and that comes closer to what we would think of as a question of law. There— No, but can the tax court say, we're trying to figure out what the paintings are worth at the time of death, and the tax court knows what they're sold for two years later, some number of years later. Can it say, I know what they were sold for some number of years later, I will take that into account? As corroboration or rebuttal in this case, which it was very careful to do, to address that particular subsequent event, and that you can see in pages 59 through 60 of your excerpt of record. It used it solely as a test of the estate expert's valuation, and that is completely proper use. I quote from this court's opinion in Marcy, actual sales between a willing buyer and seller are evidence of what the hypothetical buyer and seller would agree on, and that makes complete sense. If you buy something for half a million, and three and a half years later, you flip it for four times the price, then you would want to know what the reason was to check whether you overvalued it or undervalued it, in this case, on the date of death. And there's a case cited by the estate, actually, called Jacobs, that has this kind of, where the tax court used that valuation several years later, actually, with a kind of property that also worth quite a bit. That was a hotel that was worth, that was valued in 1920 for about a little short of $900,000, and then the tax court talked about its values. That became higher several years later in 23 and 24, and then explained that, well, the hotel was renovated in the interim, it was rebranded, therefore, the market appreciation there can't necessarily mean that the valuation in 1920 wasn't undervalued. Well, but isn't it a little suspect here that your expert's valuation just happened to be the same value that Maypole sold for was the same to the dollar, wasn't it? Well, I agree that that certainly raises questions, but there is no evidence that our expert used it as a basis for the value he used as comparables. The estate, also on appeal, did not attack our expert's methodology, and that should have been the bedrock of their argument, but they didn't do that here. And also, and this is more of a subtle point that I didn't realize before, actually, this $2.1 million figure that our expert gave was based on the, not the hammer price of his comparables, but of the hammer price plus the buyer's premium, and you can see that because the comparables had prices that weren't round numbers, and that was discussed in the trial. So, the $2.1 million, and our expert also testified to this, was with the buyer's premium. So, it's not exactly apples to apples here. Well, I guess, sale has to occur in a reasonable amount of time after the date of death, correct? That is what the cases say, yes. Right. So, it's four years within that reasonable amount of time, and what can you point me to, what's your best case or best authority to say that it is? Jacobs, Your Honor, and none of the cases that say a reasonable time advocate for hard cutoff, and as I was trying to illustrate with my example with the house, it really depends on the kind of property you're talking about, the value range we're talking about, and the kind of discrepancy that would strike a person as a dramatic increase or decrease, and that would ask for an explanation. I want to ask you about the use of the subsequent sale. Yes. Let's assume that you put on no expert. We put on no expert? Yes. Okay. And just assume it, and they put on an expert that said it was worth $500,000, and you had a sale for $2.1 million. Okay. Could they, I take it that the tax court could not reach the conclusion based on that evidence that it was worth $2.1 million, could it? It cannot use it as something that is foreseeable, that would have affected the valuation of the reasonable buyer and seller, because it's not foreseeable. You can only use it there after you get a valuation to say, well, this valuation isn't that far off, because it turns out it's quite close to what it was sold for. Correct. But in your scenario where we didn't have an expert and— Okay. So now I'm going, now let's use that for a second. Okay. My concern here is whether or not the tax court in effect did what you said it couldn't do. In other words, it started with the notion that the value was the sale value. Okay. And then said, and by the way, the expert's opinion corroborates my valuation. You agree that wouldn't be appropriate, right? Correct. And why didn't, but isn't, why isn't that what it did here? Because of the way that page 59 of the excerpts read. That is the opinion. It only used it as a test on Mr. Wachter's value. It said, Mr. Wachter gave these explanations for why his value was so far off from the sale value, and we don't find these explanations persuasive. Um, he, um, the tax court did go on to talk about Dr. Cardile's 2.1 million value and use that as a basis. So I think the estates, if we were to attack the tax court's adoption, initially at least, of our expert's 2.1 million, the estate would have had to attack the methodology of our expert, and it did not. And also, this coincidence kind of argument, it's a little neither here nor there, because they could make the same argument if we, if the expert had valued it at 1.9, 2.3, you know, something close. So that could be the cherry on top of that argument, on an attack on our methodology, but it can't be the sole basis. Can you deal with the question Judge McGee asked? Yes. It took four years to make this judgment. Yes. Six, almost six. Oh, the judgment, okay. Yeah, four years for the sale, six years for the judgment. So we're 10 years after the death, and interest is running at a rate that doesn't approximate the real cost of money. Do we have any ability to remedy that problem here? I'm sorry. This Court does not have jurisdiction to review an issue that the tax court did not, and that's clear in McCoy. So could the estate, you know, the beneficiaries have gone to the tax court and said, wait a minute, interest ought to stop running here. You're taking forever. Or is that a remedy that the tax court could give? A remedy being please issue a decision faster or please obey interest? We're getting killed by the interest here because you're waiting so long. Well, first of all, as Judge McGee also said, I think, I'm sorry, you could have prepaid the interest or the principal, and by litigating in the tax court, you run the risk. It's a prepayment form of interest running. I suppose, yes, they could have filed a motion asking the court to issue a decision faster procedurally. Maybe that would be okay, but it didn't. Because the interest here on the deficiency is equal, if not more, than the deficiency itself, correct? According to the papers, yes. And interest is still accruing today as we speak? Uh, apparently so. I do not know. As to show, I probably, probably. But then this is a prepayment form. They could have litigated in district court where they would have to prepay, or they could have deposited with the IRS to stop the interest from running. And it did not take advantage of either of these mechanisms. Um, would the court be interested in our view of the cleaned condition of the paintings as a subsequent event? I'll go through that very quickly. You're like, so, um, the tax court used the, used the cleaned condition of the paintings as both direct evidence, both primary evidence of what was foreseeable by the reasonable buyer, reasonably informed device. And then they could buy and sell it and ask for operation. Um, so as to the first one, not the second one, I understand the corroboration. Yes. How can the clean condition, if there is some doubt about what the clean condition will be, how can the clean condition be evidence of what was reasonably foreseeable? I'm sorry, I'm not sure. It seems to me it would be a tautology. In other words, what you're saying is the, uh, no one knows precisely what the clean condition will be. There's a risk that the clean condition won't be as good as it turned out to be, but I'm looking at how it turned out and that tells me what it, what somebody should have known at the time. That strikes me as well. Corroboration, I understand, but the first part I don't understand. Yeah, but there is evidence in, well, our argument is that the paintings weren't so clean that you couldn't tell what was underneath. Right, and I understand that argument. Right. But now you're saying, and in fact, when they cleaned up quite nicely, and that's evidence that they weren't that dirty. Um. I mean, that's a subsequent event, isn't it? Yeah, right, yeah, yeah. The corroboration part, I think, is, it goes to the assessment of the credibility of the witnesses who said that they could see that it would clean up nicely. It's not substantive evidence itself. Right. Of that, that anybody looking at them would know what they would look like later. That a train died, yes. Right, and I also wanted to answer the estate's argument that the tax court never addressed Mr. Walker's argument that there was substantial risk that it would not clean up well, and I point the court to page 49 of the excerpts of record, where I quote, In sum, Mr. Walker's chief assertion is that Maypole's condition on the valuation date was so poor that there was no way to have known for certain its inherent value. And a page later, it said the same thing about the Orpheus. And then a page later, starting at the bottom of page 52, on the basis of other substantial evidence in the record, we are convinced that Mr. Walker exaggerated the dirtiness of the paintings on the valuation date and the risks involved in cleaning them. And then going on to pages 56, 57, the conservators both judged cleaning to be a well-advised and low-risk undertaking. This information was readily discoverable. So the tax court knew exactly what it was talking about, what kind of risk it was talking about, especially also when you take into account the fact that on pages 52 to 53, the tax court discussed the fact that there was no evidence of a conversation between Mr. Highland, the executor, and Mr. Walker about how dangerous and how risky it would to clean these paintings. And that's separate and apart from whatever you could see of the condition of the paintings. So to sum up, the tax court used the subsequent events correctly, both the clean condition, both as a primary evidence and as a corroboration of how the subsequent sale price of the Maypole as a corroboration only. And also, the court then discussed this with the estate's attorney. But the tax court was also correct that Mr. Walker did not use comparables. Therefore, we would ask the court to affirm. Thank you. I'll give you one minute to respond. I reserved four. But you used it all. I did. Oh, I didn't realize. Second circuit, sorry. With regard to the paying the amount into the court, we never anticipated this would take six years. Well, can we fix? I mean, I understand the problem. Do we have the power to fix it? I would have thought the court had inherent power to remedy. Oh, I'd love to have inherent power to do anything, but isn't there a statute? There's a statute and it applies to court employees. This is a tough one. I hear you, but it's a serious issue. I don't have anything better to say than that. And really quickly, with regard to the issues that were just raised with regard to the opinion, talking about Mr. Walker's opinion, the section cited go on to discuss the risk to cleaning the painting. So at 53, for example, the first part, they do cite Mr. Walker's concern, but then in addressing the concern, the court gets it wrong and talks about the risk inherent in cleaning the painting that the Lowy people talk about in both instances. To answer the question about whether the court relied on the subsequent valuation and how it did, it certainly did. It's the last thing on page ER 60. The court expressly found that the January 2009 auction price cast out on Mr. Walker's valuation. And in terms of whether the 2.1 million versus the 2.1 million, the testimony was people give valuations based on the hammer price and the hammer price was the 2.1 million. The buyer's premium is a different issue. There's nothing else. Thank you. Thank you both for your oral argument presentations here today. The case of a state of Eva Franzen Colesman versus Commissioner of Internal Revenue is submitted.
judges: Murguia, Hurwitz, Zipps